1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                              No. 1:15-cr-10153-WGY-2

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   NICHOLAS ALEXANDER ROVINSKI

11

12

13                         * * * * * * * *

14

                          For Hearing Before:
15                     Judge William G. Young

16
                            Plea Change
17

18                     United States District Court
                       District of Massachusetts (Boston)
19                     One Courthouse Way
                       Boston, Massachusetts 02210
20                     Thursday, September 22, 2016

21                         * * * * * * *

22
                   REPORTER: RICHARD H. ROMANOW, RPR
23                        Official Court Reporter
                      United States District Court
24        One Courthouse Way, Room 5510, Boston, MA 02210
                          bulldog@richromanow.com

25

1                    A P P E A R A N C E S

2

3    B. STEPHANIE SIEGMANN, ESQ.
     GREGORY R. GONZALEZ, ESQ.
4        United States Attorney's Office
         J. Joseph Moakley U.S. Courthouse
5        1 Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
6        (617) 748-3664
         Email: Stephanie.siegmann@usdoj.gov
7        For the United States

8

9    WILLIAM W. FICK, ESQ.
         Federal Public Defender's Office
10       District of Massachusetts
         51 Sleeper Street, 5th Floor
11       Boston, Massachusetts 02210
         (617) 223-8061
12       Email: William_fick@fd.org
         For Nicholas Alexander Rovinski

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              P R O C E E D I N G S

2         (Begins, 2:00 p.m.)

3         THE CLERK:  Now hearing Criminal Matter 15-10153,

4   the United States of America versus Nicholas Alexander

5   Rovinski.

6         THE COURT:  Good afternoon.  Would counsel

7   identify themselves.

8         MS. SIEGMANN:  Good afternoon, your Honor,

9   Stephanie Siegmann for the United States, and with me at

10  counsel table is Gregory Gonzalez from the

11  counterterrorism section of the Department of Justice.

12        MR. FICK:  Good afternoon, your Honor, William

13  Fick for Mr. Rovinski, who is here as well.

14        THE COURT:  Well, Mr. Fick, let me congratulate

15  you on your new venture and wish you well.

16        MR. FICK:  Thank you, your Honor.

17        THE COURT:  Do I understand that Mr. Rovinski

18  desires to tender a plea of guilty?

19        MR. FICK:  He does, your Honor.

20        THE COURT:  He may come forward to be inquired of.

21        And could I have the original plea document?

22        MS. SIEGMANN:  Mr. Fick has the original plea

23  document.

24        THE COURT:  Fine.

25        (THE DEFENDANT, sworn.)
```

1          THE COURT:  Could you state your full name.

2          THE DEFENDANT:  Nicholas Alexander Rovinski.

3          THE COURT:  Mr. Rovinski, my name is Bill Young,

4    I'm the judge who presides in this session of the court.

5    Now, when I asked your lawyer, he told me that you were

6    prepared to plead guilty to the charges against you.

7    Before I can let you plead guilty, and it's up to me, I

8    have to find out a variety of things.  I have to find

9    out that you know what you're doing, I have to find out

10   that you know what you give up because you give up

11   things that are terribly important to you if you plead

12   guilty.  I have to be sure that you know what you're

13   letting yourself in for if you plead guilty.

14         Now under the circumstances of this plea, the way

15   you and your lawyer have negotiated with the government,

16   if I accept this plea -- and this is the type of plea I

17   call a "take-it-or-leave-it plea," if I leave it, if at

18   the time of sentencing I decide not to go along with it,

19   you haven't pled guilty, you're looking at a trial,

20   we'll see where we go.  If I accept it, we know what I'm

21   going to do within certain ranges.  And I have to be

22   sure that you know what I'm going to do.  And last, but

23   not lastly, I have to be sure that you want to plead

24   guilty.

25         Now, there's a written plea agreement here.  I've

1    read it.  The fact that you've entered into this deal

2    with the government doesn't mean you have to go through

3    with it.  If at any time as we talk, because that's what

4    we're going to do, if you decide you just assume not

5    plead guilty, just tell me, we'll stop.  While your case

6    is being prepared for trial, we'll let Mr. Fick go back

7    to preparing it for trial.  And that's fine by me.  I'm

8    never going to be angry with that.  If we go to trial

9    and you were convicted, I would never, not one day in

10   prison, punish you because you went to trial.

11        You understand these things?

12        THE DEFENDANT:  Yes, your Honor.

13        THE COURT:  And lastly, I have to be sure the

14   government has enough evidence that if we did go to

15   trial on these charges you could be found guilty of

16   these two charges.  Now to find that out I'm going to

17   ask the prosecutors, the United States Attorneys, and

18   you and I will both listen to what she tells us, and

19   then I'm going to say to you, "Well, is that true?"

20        You understand that's how we're going to proceed

21   here?  You do understand?

22        THE DEFENDANT:  I do.  I do understand, your

23   Honor.

24        THE COURT:  Well, let's start with the "Do you

25   know what you're doing?"

1          How old are you, sir?

2          THE DEFENDANT:  I'm 25 years old.

3          THE COURT:  How far did you go in school?

4          THE DEFENDANT:  Um, 11th grade.  I received my GED

5    at a community college.

6          THE COURT:  All right.

7          Have you ever been treated for any mental illness

8    of any sort?

9          THE DEFENDANT:  No, your Honor.

10          THE COURT:  Are you aware of any mental illness

11    that you may have?

12          THE DEFENDANT:  I'm unaware of any mental illness

13    that I may have.

14          THE COURT:  Are you taking any medication today?

15          THE DEFENDANT:  No, I am not.

16          THE COURT:  Under the influence of any drug?

17          THE DEFENDANT:  No.

18          THE COURT:  Under the influence of alcohol?

19          THE DEFENDANT:  No.

20          THE COURT:  Do you know what you're charged with?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Tell me.

23          THE DEFENDANT:  Two counts of conspiring to aid a

24    terrorist organization and transcending national

25    boundaries.

1        THE COURT:   Actually it's not a test but you've

2   got that pretty much exactly what the charges are.

3        All right.   What's before me is -- that involves

4   you anyway, are these two counts of conspiracy.

5        Now, before you could be found guilty of either of

6   these counts of conspiracy, the government has to prove

7   certain things, and they're both conspiracy counts but

8   they're slightly different and we'll talk about the

9   differences.   But in each of these counts, the

10  government has to prove that you, knowing what you were

11  doing, entered into a conspiracy with this fellow

12  Wright, that's what they've charged.

13       Now, a conspiracy is an actual agreement between

14  two or more people to accomplish something that the law

15  forbids.   So the first thing they have to prove is the

16  agreement.   Now the agreement doesn't have to be in

17  writing, it doesn't have to be a handshake, a wink, or a

18  nod, but it's got to be a genuine deal that you've got

19  an agreement with Wright.   You're not guilty of

20  conspiracy because as it all fell out you hung around

21  with the wrong people or even that you knew that other

22  people, Wright or somebody else or other people, that

23  you knew that they were conspiring and you didn't do

24  anything about it, that's not conspiracy, the government

25  has to prove that you entered into the conspiracy.

1          Well, the second thing they have to prove is the

2     specific intent of the conspirators.

3          Now, when the government charges a conspiracy,

4     they charge a conspiracy with a specific goal, a

5     specific violation of law that is among anyway the goals

6     of the conspirators, specifically that's in mind.  Now

7     they don't have to prove that the conspirators knew

8     which particular law they were violating, but they have

9     to prove that the idea was, the goal was to do something

10    that in fact violates the law.

11         So this is not a drug conspiracy to get drugs and

12    sell them, it's not a conspiracy to receive stolen

13    refrigerators, they've got to be specific -- and in

14    their indictment they charged it specifically, and I'm

15    going to go over that, and they've got to prove that

16    you, but not only you, they've got to prove that you and

17    Wright had this joint idea to violate the law in a

18    certain specific way.  And we're going to come back to

19    that.

20         The third thing they have to prove is that one of

21    you, or more than one, but at least one of you did

22    something, you didn't just talk about it, you actually

23    did something to further the conspiracy, to move the

24    conspiracy along, to make it operational.  Now they've

25    got to prove each one of those things to the jury beyond

1    a reasonable doubt.

2         Now let's talk about the two charges and the

3    specific intent that they've got to prove.

4         On the first conspiracy, it is -- the idea was to

5    provide material support to what we have called, an

6    organization we have called the "Islamic State of Iraq

7    and the Levant," "ISIL."  Now the President refers to

8    "ISIL," the media refers to "ISIS," people may refer to

9    it in different ways, but there's no doubt -- strike

10   that.  Our government has decided that that

11   organization, which I'll call "ISIL," that is, I guess

12   they can prove that, a designated terrorist

13   organization.

14        Now, when they say that the object of the

15   conspiracy was to provide material support to that

16   organization, they've got to prove not that you were

17   planning some violent act, not that you were, um -- had

18   some generalized law violation in mind, but you were

19   planning something that would provide material -- and

20   "material" means significant, it makes some difference,

21   not just mouthing off, that you were planning anyway

22   something that would provide material support for ISIL,

23   this designated terrorist organization.  That's the

24   first charge.

25        Do you think you understand that charge?

1        THE DEFENDANT:  Yes.

2        THE COURT:  Now, the second -- really they're

3   overlapping conspiracies but to have two separate

4   charges the government has to have -- has to shoulder

5   the burden of proving something different for each one.

6   So we've talked about the first conspiracy.

7        Now, the second conspiracy, which it's alleged to

8   be or it's like the same organization, but the goal here

9   is supposed to be -- is alleged to be -- the goal was to

10  commit acts of terrorism transcending national

11  boundaries, just what you told me you understood.  So

12  let's go over that.

13       For this one the goal was to do something, some

14  violation of the law that we consider an "act of

15  terrorism."  So what's an "act of terrorism"?  Without

16  getting too refined, it's some act of violence directed

17  with a mind toward destabilizing our society, creating

18  divisions, fear, upsetment, within our society, but

19  that's not enough, one can conceive of domestic acts of

20  terrorism.  Here the way Congress has made the violation

21  of law, the act of terrorism has to be one that in some

22  way transcends national boundaries.  Well, what that

23  means is beyond the boundaries of the United States,

24  we're talking about the United States.  That's what they

25  have to prove for the two acts of terrorism.

1          You understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Now, in this session of the court,

4     whenever someone is found guilty or pleads guilty, it is

5     possible in the specific circumstances that the

6     government wants to say to the sentencing judge, and in

7     this case it's me, "Well, these crimes or this crime

8     they're particularly bad because of this or because of

9     that or something else."  In this session of the court,

10    by which I mean here in this courtroom where I preside,

11    the way I read the Constitution, if the government's

12    going to say that and it's going to have some effect on

13    me if I come to sentence a person, they've got to prove

14    those enhancements, those things that make it worse,

15    they've got to prove those things to the jury on

16    evidence beyond a reasonable doubt.

17         Now, in your situation where what I'm given is a

18    take-it-or-leave-it plea, um, I'm going to require that

19    they spell out what it is they think you did, and I'll

20    ask you whether you agree to it, but it's not going to

21    change the range that you and Mr. Fick, on your behalf,

22    had bargained out with the government, that range is

23    what it is.  It may have an effect on where I come down

24    within that range or whether I accept it at all, but I

25    need to know because I take each one of those things

1    seriously and I require that the government prove them.

2        So let me just -- I want to tick them off now so

3    you know what they are.

4        They claim to be able to prove that the material

5    support or resources provided to ISIL were done with the

6    intent, knowledge, or reason to believe that they would

7    be used to commit or assist in the commission of a

8    violent act.  Then they say that for the purpose of

9    transcending national boundaries, that they claim to be

10   able to prove that you specifically agreed with others

11   to kill and maim persons within the United States.  Then

12   they claim that there were two or more acts or

13   transactions connected by a common criminal objective or

14   constituting part of a common scheme or plan.  They

15   claim to be able to prove that the offenses -- well,

16   this is a matter of law, that the offenses -- they'll be

17   telling me that the offenses we're talking about here

18   are felonies that involved or were intended to promote

19   the federal crime of terrorism.

20       Now, I mention those because if I'm going to count

21   those at all, if we go to trial, I'll make them prove

22   them to the jury beyond a reasonable doubt, but if I

23   accept this plea or if you go through with the plea, I

24   want them to recite that here this afternoon and I want

25   to know that you agree that those things in fact

1   happened.  So that's what we're talking about with

2   respect to the charges.

3         Do you think you understand that?

4         THE DEFENDANT:  Yes.

5         THE COURT:  Let's talk about your rights, very

6   serious rights, rights that you have under the

7   Constitution.

8         I keep talking about "proving."  You have the

9   right to have this case tried to a jury of the people

10   and that jury would have to agree unanimously, beyond a

11   reasonable doubt, before you could be found guilty of

12   either of these two crimes, and if you were found guilty

13   of either or both of them, before I could count any of

14   these enhancements that I just mentioned.  The jury

15   decides, not me.  My duty is to give you a fair trial.

16         At the trial you have the right to be here right

17   here in the courtroom, you can look at the witnesses as

18   they testify, but more important than just looking at

19   them in the courtroom and seeing what the evidence is,

20   Mr. Fick has the right to examine them, cross-examine

21   them, ask them questions, make arguments to the jury,

22   call witnesses on your behalf.  You have the right to

23   testify on your own behalf, give your testimony.  But

24   then there's another right, you don't have to, you don't

25   have to do anything, you have the right absolutely to be

1   silent.  And to the extent you're silent, I'm going to

2   tell this jury, if we go to trial, that you're an

3   innocent man, and that's the word I'll use,

4   "Mr. Rovinski is innocent, he cannot be found guilty

5   unless you jurors come to believe unanimously beyond a

6   reasonable doubt that Mr. Rovinski is guilty."  See the

7   burden of proving here, that's on the government, and it

8   stays on the government.  It never shifts to you.  You

9   don't have to explain yourself.  Just because you're

10  arrested, you don't have to justify anything.  They've

11  got to prove it.  You don't have to prove anything.

12        Now, this business about starting innocent, that's

13  for real.  Now I see we've got you in custody, but

14  that's so you'll show up for the trial.  Mentally I have

15  to -- the jury, I want them to start you off innocent,

16  if we have a trial, and as much as my words can impress

17  that on them, I will do that.  I take you as innocent.

18  Now seriously, I don't know anything about this case

19  except -- I've read a lot of papers to get ready for the

20  case, but this is the first time you and I have met,

21  I've heard no evidence, other than reading papers I

22  don't know anything about the case, and I must tell

23  myself you're innocent, you start innocent, and that's

24  how I look at you.  And I'm not giving you anything by

25  explaining these things, these things are your rights

1    under the law, under the Constitution.

2         Now, do you understand you have these rights?

3         THE DEFENDANT:  Yes.

4         THE COURT:  Now, you tender, if you plead guilty

5    this afternoon, you say, "Judge, I'll plead guilty and

6    we'll see whether you as the judge will accept it,"

7    you've given all these rights away, we'll never have a

8    trial, we'll never get to see any evidence at all, the

9    closest we're going to come is when I ask the U.S.

10   Attorney to tell me what she hopes she could prove if we

11   went to trial, that's as close as we're going to come,

12   and then I'll say, "Well, is that true?"

13        Your right to be silent, oh, you still have that,

14   you have that up until I sentence you, but once I

15   sentence you, that right is gone as to these crimes, not

16   as to other crimes, but as to these crimes that right is

17   gone because you're guilty.  So your Fifth Amendment

18   right to be silent, that's gone.

19        Now, understand you're charged with this fellow

20   Wright and one imagines the government is interested in

21   how all this, if anything, did happen or was conspired

22   to and the like, they're interested in how all of this

23   came to be.  Once I sentence you, you've got no right to

24   keep silent about that, you're going to have to tell.

25        Do you understand that?

1    THE DEFENDANT:  Yes, your Honor.

2    THE COURT:  And lastly, if you plead guilty here

3    this afternoon, you go from being truly innocent in my

4    eyes to being a guilty person and what's left for me to

5    decide is whether this plea agreement that I have is

6    fair and just both to you and to the interests, not of

7    the government, but of all the people who the government

8    represents, that's what I have to figure out, that's the

9    only thing left, but I think you're guilty.

10    You understand that?  Do you?

11    THE DEFENDANT:  Yes, your Honor.

12    THE COURT:  Counsel, why don't you come up here.

13    I just want to show you the plea documents, that's why

14    I'm coming down.

15    (Sidebar sealed.)

1            (In open court.)

2            THE COURT:  Now, what we need to know is what the

3     deal is here because all that's left is whether I'm

4     going to go for this deal or not.  We won't know that

5     today, I'm going to need a presentence report.  But as I

6     started out, this is a take-it-or-leave-it plea, that --

7     to the judge, and that means -- and it's perfectly

8     appropriate under the rules for your counsel and the

9     government and you to enter into a deal, and that deal

10    in essence sets the parameters of what I can do.  But

11    the first thing I can do is just refuse to accept it.

12    If I refuse to accept it, what we do here this afternoon

13    doesn't count, even if you tender your plea, you go back

14    to being an innocent man, but you're an innocent man

15    charged with these crimes and we'll get you to trial and

16    see how that works out.  If I accept the plea, here's

17    what will happen, I mean, because this is the deal.  I

18    will sentence you for at least 15 years but not more

19    than 22 years to prison.

20            You understand that?

21            THE DEFENDANT:  Yes.

22            THE COURT:  I will impose a fine on you unless I

23    think you're unable to pay a fine.  I will keep you on

24    supervised release for the rest of your life.

25            Do you understand that?

1      THE DEFENDANT:  Yes.

2      THE COURT:  Now that's like probation, that means

3  that we'll have a handle on you so that if you commit

4  some other crime or violate the terms of your supervised

5  release, I can put you back in prison or some other

6  judge can.

7      You understand that?

8      THE DEFENDANT:  Yes.

9      THE COURT:  That's for the rest of your life.

10      THE DEFENDANT:  Yes.

11      THE COURT:  And I will impose upon you a mandatory

12  special assessment of $200.

13      Do you understand that?

14      THE DEFENDANT:  Yes.

15      THE COURT:  Now, other than this plea document,

16  these papers that we've just gone over, is there any

17  other agreement, any other deal, any other promise that

18  the government has made to you that's not here?

19      THE DEFENDANT:  No, there has not been.

20      THE COURT:  Have they threatened you with anything

21  to get you to plead guilty?

22      THE DEFENDANT:  No.

23      THE COURT:  Now, in this type of case, and in

24  every case really I should ask, are you covering up for

25  anyone else by pleading guilty yourself?

1          THE DEFENDANT:  I'm not.

2          THE COURT:  You should know that if you're not a

3     citizen of the United States, conviction of these crimes

4     may have the consequence of your being denied admission

5     to the United States, denied naturalization under the

6     laws of the United States, and if you're not a citizen

7     it may result in your deportation, do you understand

8     that?

9          THE DEFENDANT:  Yes, I do.

10          THE COURT:  Have you had enough time to talk all

11     this over with Mr. Fick, your attorney?

12          THE DEFENDANT:  Yes, I have.

13          THE COURT:  Do you think he's been a good attorney

14     gotten for you those things that are your rights under

15     the law, we've been talking about your rights, do you

16     think he's secured those rights for you that are your

17     rights under the Constitution?

18          THE DEFENDANT:  Affirmative.

19          THE COURT:  Go ahead.

20          THE DEFENDANT:  Yes.

21          THE COURT:  Do you think he's been a good

22     attorney?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Are you satisfied with him as your

25     attorney?

1        THE DEFENDANT:  Yes.

2        THE COURT:  Do you still want to plead guilty?

3        THE DEFENDANT:  Yes.

4        THE COURT:  Why?

5        THE DEFENDANT:  I feel, um, in the interests of

6   myself and people of the United States that I should,

7   um, pay for the crimes that I have committed.

8        THE COURT:  All right.  Now I follow that, and in

9   that there is an acknowledgement that you think you have

10  committed crimes, correct, is that true?

11       THE DEFENDANT:  Yes.

12       THE COURT:  Now I'm going to ask the government to

13  tell me briefly, just touching on the essential elements

14  and the enhancements because I need to know, um, tell me

15  what you hope you can prove.

16       And you listen to this.  You don't have to agree

17  to it, but listen carefully.  If you disagree with any

18  of it, you tell me because she's going to tell me now

19  what she hopes she can prove and then I'm going to say,

20  "Do you understand that and is that true?"

21       Ms. Siegmann.

22       MS. SIEGMANN:  Had this case gone to trial the

23  government would have proven beyond a reasonable doubt

24  the following facts.

25       In November of 2014, the defendant met David

1    Wright on Facebook.  In December of 2014, defendant and

2    Wright began discussing that their mutual support for

3    ISIL, the Islamic State of Iraq and the Levant -- and as

4    your Honor said, "ISIL" is known by several names, they

5    didn't always use "ISIL," they often used "ISIS" and

6    "ISS," but for purposes of my facts today I'm going to

7    refer to it as "ISIL."  The United States government has

8    designated ISIL as a foreign terrorist organization and

9    at all times relevant to this indictment it was so

10   designated.

11       Indeed Wright and Rovinski both understood that it

12   was a terrorist organization, Mr. Rovinski understood

13   and discussed with Wright the fact that ISIL committed

14   violent acts and had called for violence and individuals

15   to kill and behead nonbelievers including people in the

16   United States.

17       In January 2015 the defendant downloaded six

18   issues of ISIL's online magazine, "Dabiq," D-A-B-I-Q,

19   which Wright had sent him via e-mail.  ISIL uses "Dabiq"

20   as a promotion and means of recruiting people and

21   propaganda.  The magazines that Mr. Rovinski downloaded

22   and viewed boasted about military victories of ISIL,

23   criticized western governments, and called its

24   supporters to kill nonbelievers and to commit violent

25   Jihad.  Wright also sent Rovinski links to other ISIL

1    materials including beheading videos and e-books.  For

2    instance on January 26th, 2016, Wright sent Rovinski a

3    link to the Islamic state 2015 full e-book which

4    contained instructions on how to travel to ISIS's

5    controlled territory in Syria through Turkey and it also

6    contained a list of twitter accounts for people that

7    live in the Islamic state.

8        Now, although initially Rahim, Usaamah -- Rahim

9    was another co-conspirator in this conspiracy as laid

10   out in the indictment, and initially Rahim -- Usaamah

11   Rahim, David Wright, and Rovinski, planned to travel

12   oversees to join the Khalify, to join the Islamic state,

13   but over time their plans changed and they began

14   planning plots, a plot to kill and commit violent Jihad

15   in the United States to kill and behead individuals

16   here.

17       After Wright introduced Rahim to ISIL, Rahim had

18   numerous conversations with people overseas, ISIL

19   members overseas, um, between the time --

20       THE COURT:  Wait a minute.

21       MS. SIEGMANN:  I'm sorry?

22       THE COURT:  After Wright introduced Rahim?  Don't

23   you mean Rovinski?

24       MS. SIEGMANN:  Sorry, I actually -- for purposes

25   of this indictment of the conspiracy, your Honor,

1    there's acts that Rahim actually committed that would --

2    that we would be proving at trial against Rovinski.   So

3    Wright actually introduced -- had conversations with

4    Rovinski, he also introduced his uncle, Usaamah Rahim,

5    to ISIL and actually, um, he indicated this is a

6    legitimate organization and that they should support

7    them.   And but for Wright, Rahim may not have ever done

8    the acts that he committed on June 2nd, 2015.   So back

9    about a year before this occurred, Wright introduced

10   Rahim to ISIL, and then after that, between the date and

11   time of February 2015 until his death in June to 2015,

12   Rahim had numerous conversations with ISIL members

13   overseas.

14          The defendant also had several conversations with

15   people located overseas using various internet-based

16   applications, messaging applications.   For instance, on

17   May 20th, 2015 he told a person named Khalid, located in

18   the United Kingdom, that he would be, quote, "carrying

19   things out here in the United States rather than

20   traveling over to Syria to join ISIL.   Similarly on that

21   same day, May 20th, 2015, Rovinski told a woman over --

22   located in the United Kingdom, that -- during a chat,

23   that he, quote, "had chosen the path of Jihad."

24   "Jihad," your Honor, is a reference to committing acts

25   of violence in the United States.

1          In March of 2015 --

2          THE COURT:  Right, at least you say in the

3     circumstances of this case it is?

4          MS. SIEGMANN:  Yes, your Honor.

5          THE COURT:  Go ahead.

6          MS. SIEGMANN:  In March 2015, Wright had obtained

7     and studied a Jihadist manual entitled "How to survive

8     in the West," which detailed how to become a sleeper

9     cell in the U.S. until ordered to attack, ordered to

10    carry out acts of violence.  Wright forwarded a link to

11    this document to Rahim, the other co-conspirator, and

12    advised Rahim, "That it is perfect for the initiative,"

13    that was a quote, "perfect for the initiative."

14          Now, all these acts were going on and they were

15    having discussions about "How can we support ISIL?" but

16    by April 2015, Rovinski, Wright, and Rahim had agreed to

17    commit attacks and kill persons inside the United States

18    which they would -- which they believed would further

19    the objectives of ISIL, would support their objectives.

20    They each took steps in furtherance of this plan.  Their

21    attack plans included the beheading of at least one

22    person, on one New York woman who's identified in the

23    indictment as "Intended Victim 1."  As a matter of

24    public record, "Intended Victim 1" is Pamela Geller, and

25    she has acknowledged it as such and publicly

1    acknowledged this recently.

2         In 2015 ISIL had issued a fatwah, F-A-T-W-A-H, or

3    religious decree -- and that's the Arabic word, your

4    Honor, um, to its supporters calling for her murder.

5    Ms. Geller had organized a Muhammad art exhibit and

6    contest in Garland, Texas on May 3rd, 2015, and

7    severally from the plans of Rovinski and his

8    conspirators, two armed men had attempted to attack that

9    contest and kill Ms. Geller, but before they were able

10   to do so, they were killed by law enforcement.

11        Minutes after this attack occurred, an individual

12   by the name of Junaid Hussain, an ISIL member located in

13   Syria, had tweeted, using his twitter account, "Two of

14   our brothers just open fire at the Prophet Muhammad art

15   exhibit in Texas, kill those who insult the prophet,"

16   hash-tag, "Garland shooting."  Hussain used twitter to

17   encourage terrorist attacks in United States and Europe

18   against persons whom ISIL had decided were worthy of

19   killing, that they believed should be targeted, should

20   be killed, and wanted them executed.  Pamela Geller was

21   one of those people.  Hussain was killed by a drone

22   strike on August 24th, 2015.

23        In May, a few months before his murder -- I'm

24   sorry, in May, a few months before he was killed,

25   Hussain, who was located in Syria, had directly

communicated with Usaamah Rahim concerning the murder of

Geller.  On May 26th, 2015 Rahim told David Wright,

during a recorded telephone conversation, that he had

received an encrypted document from Mr. Hussain with

details about the woman in New York who likes to insult

the Prophet Muhammad.  And between May 25th and May

27th, 2015, Rahim had purchased three knives, three

knives ranging in size between -- ranging in size of 13

to 15 inches from Amazon.com, the last of which was

delivered to his residence on May 30th.

Between -- and he wasn't the only one that

researched or looked at weapons in this case, your

Honor, between April and June 2015, Rovinski researched

knives and weapons using the internet.  Rovinski also

viewed videos on how to make weapons on Youtube and

downloaded those videos to his account.  In April and

May of 2015, Wright also conducted internet searches on

firearms, weapons, and law enforcement capabilities.

For instance, on April 19th, 2015, Wright had conducted

internet search queries on Google including "which

tranquilizer puts humans to sleep instantly" and he did

multiple searches on how to purchase tranquilizer guns,

taser guns, and firearms.

On May 25th, 2015, Wright conducted another

internet search querying "How to start a secret militia

in the United States," and that same day Rahim conducted
searches on Facebook on the name "Pamela Geller" and the
name of one of her relatives.

On May 31st, 2015, the defendant met with Wright
and Rovinski for more than two hours on a secluded beach
in Rhode Island where they discussed their plan to
behead Ms. Geller and Wright and Rovinski had actually
previously met on that same beach just a few weeks
earlier on or about May 9th, 2015.

Now, according to statements made by Mr. Rovinski
to law enforcement on June 2nd, 2015, all three men
agreed to murder Pamela Geller and each of them were
going to play a critical role in the planned beheading,
and killing and/or maiming a person violates both
Massachusetts General Laws as well as New York -- New
York state penal law.

And moving forward.  During a telephone
conversation on the morning of June 2nd, 2015, Rahim
informed Wright that he could not wait until July 4th to
go after their target and wanted to go after the "boys
in boy," a slang term referring to police officers in
Massachusetts.  So he wanted to attack and to go after
police officers in Massachusetts.

Wright encouraged Rahim's plan to attack the
police and die as a martyr and less than two hours after

1    Wright spoke to Rahim the police -- I'm sorry Rahim was

2    killed when he lunged with a knife towards police

3    officers and special agents of the FBI in a Roslindale

4    parking lot after being repeatedly asked to drop his

5    knife.

6         After Rahim was killed, Hussain, Junaid Hussain,

7    the individual in Syria, the ISIL member, the recruiter,

8    acknowledged -- publicly acknowledged that he had

9    directly communicated with Rahim and at trial the

10   government would have proven that these communications

11   demonstrate the significance of this conspiracy, a

12   conspiracy in which Rovinski was involved.

13        On June 12th, 2015, using twitter, Hussain

14   described Usaamah Rahim as a martyr in Boston who was

15   involved in a plan, quote, "to behead Pamela Geller."

16   Hussain further acknowledged that he had spoken to Rahim

17   and during their last conversation Hussain had

18   instructed Rahim to "carry a knife in case the Feds

19   tried to arrest him."  Because of that knife Hussain

20   explained Rahim became a martyr rather than be arrested.

21        Even after the defendant was arrested on June

22   11th, 2015, he continued to engage in activity designed

23   to further the conspiracy, the plan to commit violent

24   attacks in the United States.  In August 2015, Rovinski

25   wrote two letters addressed to his co-defendant and

1    conspirator, "Daoud Wright," and that's how they're

2    addressed, "Daoud Wright," and Rovinski attempted to

3    recruit people while in jail to assist in their plan to

4    kill people in the United States on behalf of ISIL

5    because his intention, as was it the intention of Wright

6    and Rahim, was to bring down the United States

7    government.

8         THE COURT:  Well, just a moment.  You say he wrote

9    two letters to Wright, but you didn't characterize the

10   letters at all?

11        MS. SIEGMANN:  I'm going to do that.  You're

12   right, your Honor.  I'm going to summarize them right

13   now.

14        THE COURT:  Oh, go right ahead.

15        MS. SIEGMANN:  The government recovered both of

16   those letters before they could be sent or delivered to

17   Mr. Wright, and in the first letter Rovinski informed

18   Wright that he, Rovinski, had found an inmate that would

19   assist them in their plan to take down the Eastern Coast

20   -- that's a quote, "the Eastern Coast and ultimately the

21   U.S. government by killing and beheading people."

22   Included in this plan Rovinski wrote that he intended

23   to, quote, "place their juicy heads for display, the

24   victory will be ours, use any resource possible, surely

25   we will persevere and win," end quote.

1          Now the government would have proven at trial that

2     the term "juicy heads" and "juicy necks" was a term that

3     Rovinski, Wright, and Rahim use often and it was used to

4     refer to beheadings, and since June of 2014 ISIL has

5     been distributing beheading videos and promoting

6     decapitation as an acceptable means of killing

7     nonbelievers.

8          Rovinski concluded this letter by pledging

9     allegiance to ISIL's leader, he wrote, "I give full

10    bayah," B-A-Y-A-H, which is an Arabic word meaning

11    "allegiance," "to Amir Abu Bakr Al-Baghdadi and the

12    Khalify."  And, your Honor, Abu Bakr Al-Baghdadi is the

13    leader of ISIL, the "Khalify" is a term that refers to

14    the Islamic state.

15         Now turning to the second letter, similarly in

16    Rovinski's second letter he advised Wright that he had,

17    quote, "acquired a recruit," end quote, from the jail

18    that had pledged allegiance and support to ISIL and the

19    defendant wrote to Wright, in pertinent part, quote, "We

20    will try to get ammo and more personnel to coordinate

21    our attack.  Leave no stone unturned.  We need to leave

22    them blind.  This is going to be worse than Genghis

23    Khan.  Can't wait for them juicy necks."  Again, the

24    term "juicy necks" referring to beheadings.

25         Your Honor, based upon these facts, among others,

```
 1   the government is confident it could prove the defendant
 2   guilty at trial that he intended to engage and conspired
 3   to engage in an act of terrorism to promote violence and
 4   with the intent of supporting ISIL and bringing down the
 5   U.S. government.
 6        THE COURT:  Did you hear what Ms. Siegmann had to
 7   say?
 8        MR. FICK:  May I interject one moment, your Honor,
 9   before you inquire?
10        THE COURT:  You may.
11        MR. FICK:  I just wanted to carve out for the
12   Court that there's a lot of information in the
13   government's recitation there as to which Mr. Rovinski
14   doesn't necessarily or doesn't have personal knowledge
15   such as Rahim's communications abroad, but we
16   acknowledge and understand that as co-conspirator
17   statements and activity that would come in at trial.
18        THE COURT:  I thank you and I had intended to ask
19   a couple of questions and I will.
20        MR. FICK:  Thank you, your Honor.
21        THE COURT:  Did you hear what she had to say?
22        THE DEFENDANT:  Yes, I did, your Honor.
23        THE COURT:  Do you understand what she had to say?
24        THE DEFENDANT:  Yes, your Honor.
25        THE COURT:  Now, insofar as she referred
```

1  specifically to you and referred to your agreeing, your

2  researching, your writing, your communicating, are all

3  those things true?

4       THE DEFENDANT:  Yes, they are.

5       THE COURT:  All right.  And did you understand and

6  agree to the various goals that she laid out there in

7  her recitation?

8       THE DEFENDANT:  Yes.

9       THE COURT:  So as I understand it, and this --

10  they're all important questions but now I'm getting to

11  the end, I mean you're prepared to plead guilty because

12  you acknowledge you are guilty of these crimes, you're

13  hoping I will accept this deal that you worked out with

14  the government, but you acknowledge you are in fact

15  guilty, is that true?

16       THE DEFENDANT:  Yes.

17       THE COURT:  Thank you.

18       I find that Nicholas Rovinski, knowingly,

19  intelligently, and voluntarily exercises his right to

20  tender a plea of guilty to the two counts of the

21  indictment and the Clerk may receive the tender.

22       Now, I understand that this is a

23  take-it-or-leave-it plea, so she's going to -- the Clerk

24  now is going to ask you, she'll say, "You earlier

25  pleaded not guilty, do you want to change your plea from

1    not guilty to guilty?" and if you want to stop, say

2    "No," and we'll stop, but if you want to plead, say

3    "Yes."  And then she'll say, "How do you plead, guilty

4    or not guilty?"  If you say "Guilty," then in my eyes

5    you're guilty, there's no taking it back -- you can't

6    get it back unless, for whatever reason, I come to

7    believe that I'm not going to go along with this plea

8    agreement, then it doesn't count and in essence we start

9    over, you're innocent and you're awaiting trial.  But if

10   I were to accept this, when we come on for sentencing,

11   we don't know exactly what the sentence will be and I

12   have a lot of thinking to do, but I will follow the

13   agreement.

14        Do you understand that's how it works?

15        THE DEFENDANT:  Yes.

16        THE COURT:  All right.  The Clerk may accept

17   Mr. Rovinski's tender of a plea of guilty.

18        THE CLERK:  Mr. Rovinski, you have previously pled

19   not guilty to a two-count superseding indictment

20   charging you in Count 1(f), conspiracy to provide

21   material support to designated foreign terrorist

22   organization, in violation of Title 18, United States

23   Code, Section 2339(b)(a)(1), and Count 4(f), conspiracy

24   to commit acts of terrorism transcending national

25   boundaries in violation of Title 18, United States Code,

1   Section 2332(b)(a)(2) and (c).

2          Do you now wish to change your plea, "Yes" or

3   "No"?

4          THE DEFENDANT:  Yes.

5          THE CLERK:  How do you now plead to Counts 1(f)

6   and 4(f), guilty or not guilty?

7          THE DEFENDANT:  Guilty.

8          THE COURT:  Thank you.  You may step down.

9          (Defendant steps down.)

10          THE COURT:  I propose sentencing for the 23rd of

11   March 2017 at 2:00 p.m., is that satisfactory,

12   Ms. Siegmann?

13          MS. SIEGMANN:  Yes, your Honor.

14          THE COURT:  And, Mr. Fick, is that satisfactory?

15          MR. FICK:  Yes, your Honor.

16          THE COURT:  Very well.  That's the date for

17   sentencing.  He's remanded to the custody of the

18   marshals.  We'll recess.

19          (Ends, 2:50 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Thursday, September

8     22, 2016, to the best of my skill and ability.

9

10

11

12

13     /s/ Richard H. Romanow 10-11-16
       _____
14     RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25