UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES,                      )
                                    )        No. 15-cr-10153-WGY
v.                                  )
                                    )
NICHOLAS ROVINSKI,                  )
        *Defendant.*                )
_____)

## MOTION FOR COMPASSIONATE RELEASE
## UNDER 18 U.S.C. § 3582(c)(1)(A)

Nicholas Ronvisnki respectfully moves this Court for an order reducing his sentence to

"time served" based on "extraordinary and compelling reasons" related to the COVID-19

pandemic, as set forth below, pursuant to 18 U.S.C. §3582(c)(1)(A)(i). Mr. Rovinski requests

that the Court schedule a hearing on this motion at its earliest convenience.

Mr. Rovinski, now 29 years old, is incarcerated at FCI Danbury, where one of the first

major COVID-19 outbreaks in the federal Bureau of Prisons is ongoing. The conditions at

Danbury are so dire that a federal court in the District of Connecticut recently found that they

likely violate the Eighth Amendment. *See Martinez-Brooks v. Easter,* No. 3:20-cv-00569-MPS,

2020 U.S. Dist. LEXIS 83300 at *3-*4 (D. Conn. May 12, 2020) (granting in part motion for

temporary restraining order and preliminary injunction). Moreover, Mr. Rovinski is medically

vulnerable, as an individual with cerebral palsy, cognitive limitations, hypertension, and

depression.

Mr. Rovinski has approximately 94 months remaining to serve on a 180-month sentence

for so-called "terrorism" offenses. But as this is Court is aware from Mr. Rovinski's testimony at

the trial of his co-defendant, and from sentencing submissions concerning Mr. Rovinski's actual

conduct and characteristics, the "terrorist" label, with all that it connotes, is inapt.[1] He was

uniquely vulnerable young man who for a time, with his thoughts and words, adopted a violent

extremist ideology, expressed readiness to sign on to plans of co-conspirators, and suggested

fantastical schemes of his own. But he never came close to causing or participating in any actual

violence and, as the medical and psychiatric information demonstrated, he was uniquely ill-

equipped ever to do so. He came to his senses and went on to do everything he could to make

things right, earning the respect and empathy of the FBI case agents in the process.

It is unspeakably tragic that the disabilities that first rendered Mr. Rovinski vulnerable to

the odious siren song of his co-conspirators now also expose him to severe illness and death

while he serves the extremely harsh sentence that the law required this Court to impose. In these

unique and extraordinary circumstances, this Court should exercise its power and discretion to

reduce Mr. Rovinski's sentence to a term of "time served" and order his immediate release to

begin his lifetime term of supervised release in self-quarantine at his mother's home in Warwick,

Rhode Island. To the extent the Court deems necessary, it could order some portion of

supervised release to be served in home confinement.

## BACKGROUND

Pursuant to a Fed. R. Crim. P. 11(c)(1)(C) plea agreement, Mr. Rovinski pled guilty to

conspiracy to provide material support to a designated foreign terrorist organization, in violation

of 18 U.S.C. § 2339B(a)(1), and conspiracy to commit acts of terrorism transcending national

boundaries, in violation of 18 U.S.C. § 2332b(a)(2). On December 20, 2017, the Court sentenced

---

[1] More detailed information is available Mr. Rovisnki's Sentencing Memorandum [D.E. 408] and in the sealed psychiatric evaluation by Dr. Julia Reade submitted to the Court at that time to assist with sentencing (hereinafter "Psych. Eval."). Undersigned counsel will provide a courtesy copy of the evaluation to the Clerk for the Court's convenience at the time of filing this motion. Mr. Rovinksi is also separately filing his BOP medical records under seal as Exhibit 1.

Mr. Rovinski to a mandatory minimum sentence of fifteen years (180 months) of imprisonment and a lifetime of supervised release. Mr. Rovinski has approximately 94 months left to serve on the custodial portion of the sentence.[2]

On April 24, 2020, undersigned counsel sent a letter by both e-mail and U.S. mail requesting that Mr. Rovinski be considered for transfer to home confinement pursuant to the CARES Act and Attorney General Barr's Memoranda, or alternatively, considered for BOP-initiated compassionate release. *See* Exhibit 2.

To date, neither he nor counsel have received any response from the warden.

## ARGUMENT

### I.      Mr. Rovinski has satisfied the exhaustion requirement.

After passage of the First Step Act, the Court may consider a defendant's motion for reduction of sentence once s/he has exhausted administrative remedies or upon "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C.  § 3582(c)(1)(A).

Mr. Rovinski has satisfied this requirement because 30 days have lapsed since he submitted his request. *See United States v. Joling*, No. 6:11-cr-60131-AA, 2020 U.S. Dist. LEXIS 67953 at *5 (D. Or. Apr. 17, 2020) (finding exhaustion shown based on lapse of 30 days); *United States v. Amarrah*, No. 17-20464, 2020 U.S. Dist. LEXIS 80396, at *11 (E.D. Mich. May 7, 2020) (same); *United States v. Ardila*, No. 03-cr-264-SRU, 2020 U.S. Dist. LEXIS 77010, at *2-3 (D. Conn. May 1, 2020) (same); *United States v. Washington*, 07-cr-00258-CMR, D.E. 529, at 2-3 (E.D. Pa. May 14, 2020) (same); *United States v. Robinson*, No. 18-cr-00597-

---

[2] The BOP on-line "inmate locator" indicates that Mr. Rovinski's projected sentence completion date is April 18, 2028. *See* https://www.bop.gov/inmateloc/.

RS-1, 2020 U.S. Dist. LEXIS 73575, at *5 (N.D. Cal. Apr. 27, 2020); *United States v. Norris*, 17-cr-00106-SRU, 2020 U.S. Dist. LEXIS 70219, at *3 (D. Conn. Apr. 16, 2020).

Moreover, as this Court found in *United States v. Ramirez*, "it has the discretion to waive the [30-day] requirement." *United States v. Ramirez,* No. 17-10328-WGY, 2020 U.S. Dist. LEXIS 83363, at *18-22 (D. Mass. May 12, 2020*)* (collecting cases waiving exhaustion requirement, including for defendants with significant amounts of time left on their sentences); *see also United States v. Guzman-Soto,* No. 1:18-cr-10086-IT, 2020 U.S. Dist. LEXIS 67912, at *13 (D. Mass. Apr. 17, 2020) (waiving exhaustion requirement); *United States v. White,* 00-30027-MGM-4, D.E. 538 & 539 at 2 (D. Mass. April 10, 2020 ) (same); *United States v. Diaz*, No. 1:16-cr-10215-RWZ, D.E. 288 (D. Mass. April 23, 2020); *United States v. Coles*, No. 00-cr-20051, 2020 U.S. Dist. LEXIS 72327 at *12 (C.D. Ill. Apr. 24, 2020);  *United States v. McCarthy,* No. 3:17-CR-0230-JCH, 2020 U.S. Dist. LEXIS 61759 at *8 (D. Conn. Apr. 8, 2020); *United States v. Perez,* No. 17-cr-513-3-AT, 2020 U.S. Dist. LEXIS 57265 at *4, *5-9 (S.D.N.Y. Apr. 1, 2020)*; United States v. Colvin,* No. 19-cr-179-JBA, 2020 U.S. Dist. LEXIS 57962 at *3-6 (D. Conn. Apr. 2, 2020); *but see United States v. Raia*, 954 F.3d 594 (3d Cir. 2020) (finding that the failure to exhaust or wait 30 days "presents a glaring roadblock foreclosing compassionate release at this point"), *pet. for reh'g filed* Apr. 14, 2020.[3]

Requiring any further exhaustion here would also be futile. *See Perez,* 2020 U.S. Dist. LEXIS 57265 at *5-*8 (excusing exhaustion requirement on this basis); *United States v. Bess*, No. 16-cr-156, 2020 U.S. Dist. LEXIS 71056, at *10-*11 (W.D.N.Y. Apr. 22, 2020) (same). The

---

[3] Numerous organizations have filed amicus briefs in support of rehearing in *Raia*, including a brief by former federal judges. *See* Brief of Amici Curiae Former Members of the Judiciary, *United States v. Raia*, Third Circuit No. 20-1033, D.E. 31 at 7-8 (Apr. 14, 2020).

BOP has adopted a blanket policy of excluding individuals with "terrorism" convictions from consideration for home confinement, without any individualized consideration. *See* Hurwitz, Memorandum for Chief Executive Officers (Apr. 22, 2020) ("April 22 guidance").[4]  And its policy regarding compassionate release does not permit consideration of the risks posed by COVID-19 when evaluating compassionate release requests. *See* Program Statement 5050.50 (pre-dating the COVID-19 pandemic); *United States v. Pena*, No. 16-cr-10236-MLW, 5/13/20 Tr. at 31 (testimony from Warden at FMC Devens that under BOP policy, he "didn't consider . . . whether the COVID-19 pandemic constituted extraordinary and compelling circumstances that would justify release," attached as Exhibit 3); *Martinez-Brooks v. Easter*, 20-cv-00569-MPS, D.E. 30 at 55 (D. Ct. May 12, 2020) ("during the COVID-19 crisis at FCI Danbury, [it is] impossible to find any success within the existing administrative remedy process; the applicable standards appear to make no allowance for the grave risks posed by COVID-19").

II.    **The Court should grant compassionate release to Mr. Rovinski because of his unique vulnerabilities to COVID-19 and the outbreak occurring at FCI Danbury.**

A.    **Legal Standard**

As amended by the First Step Act ("FSA"), section 3582(c)(1)(A) gives the Court the authority to grant a reduction in sentence (compassionate release) if, "after consideration the factors set forth in section 3553(a)[,] … it finds that extraordinary and compelling reasons warrant such a reduction[.]" 18 U.S.C. § 3582(c)(1)(A)(i).

Congress directed the Sentencing Commission to define the term "extraordinary and compelling reasons." 18 U.S.C. § 994(t). The Commission did so prior to the passage of the First Step Act but has not since updated its policy statement. *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D).

---

[4] *Available at* https://famm.org/wp-content/uploads/bop-memo-4.23.2020.pdf.

In subsections (A)-(C) of an Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness or serious medical condition which "substantially diminish[es]" the defendant's capacity for self-care in prison; (B) aging-related health decline in elderly inmates who have served ten years or 75% of their sentences; or (C) two family-related circumstances. *See id.* cmt. n.1(A)-(C). The policy statement also contained a catch-all provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

This Court has joined the vast majority of courts in finding that it has discretion to utilize the "catch-all provision," "consider unlisted factors in deciding whether extraordinary and compelling circumstances exist," and ultimately make its own determination of when extraordinary and compelling reasons exist. *Ramirez*, 2020 U.S. Dist. LEXIS 83363 at *5-6; *United States v. Bucci,* 409 F. Supp. 3d 1, 2 (D. Mass. 2019); *accord Beck*, 425 F. Supp. 3d at 579; *Brown*, 411 F. Supp. 3d at 451; *United States v. Fox,* No. 2:14-CR-03-DBH, 2019 U.S. Dist. LEXIS 115388 at *7 (D. Me. July 11, 2019); *United States v. Redd*, No. 1:97-cr-00006-AJT, 2020 U.S. Dist. LEXIS 45977, at *18 (E.D. Va. Mar. 16, 2020); *United States v. Rodriguez*, E.D. Pa. No. 03-cr-271-AB, D.E. 135 at 6-12 (Apr. 1, 2020) ; *United States v. Cantu*, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019).

This Court has also found that it is "free to consider … factors such as the *risk* of inmates developing a serious condition" and that compassionate release "may be available for those at a particularly high risk from the coronavirus, provided their release is otherwise appropriate under the section 3553 factors." *Ramirez*, 2020 U.S. Dist. LEXIS 83363 at *12 (emphasis in original). The Court has further recognized that "many patients with a severe case of [COVID-19] will be

debilitated to the point that they are incapable of self-care," commensurate with the BOP's recognition of a compassionate release category for inmates with serious and debilitating medical conditions. *Id*. at 11; *see* BOP Program Statement 5050.50. This is a particularly apt observation in Mr. Rovinski's case, where not only is he medically vulnerable but he also will have a more difficult time providing self-care than most people, given his cerebral palsy, cognitive limitations, and depression, as discussed below.

**B. In light of Mr. Rovinski's unique vulnerabilities, COVID-19 and conditions at FCI Danbury are extraordinary and compelling reasons for compassionate release.**

"[N]othing could be more extraordinary and compelling than this pandemic." *United States v. Rodriguez*, No. 03-cr-271-AB, D.E. 135 at 2 (E.D. Pa. Apr. 1, 2020). This Court is well-versed in both the risks of COVID-19, the risks posed in a congregate environment like a prison, and the risks posed to individuals with medical conditions. *See Savino v. Souza*, No. 20-10617-WGY, 2020 U.S. Dist. LEXIS 61775 at *5-6 (D. Mass. Apr. 8, 2020); *Ramirez*, 2020 U.S. Dist. LEXIS 83363 at *2, *11-12 & nn.3-6. Mr. Rovinski incorporates by reference this Court's prior findings and focuses on the situation at FCI Danbury and his specific vulnerabilities.

**1. FCI Danbury is in the midst of a COVID-19 outbreak.**

As of June 6, 2020, the BOP has reported 2,183 confirmed "open" infections among inmates and staff across 60 facilities and 28 reentry centers, with 78 inmate deaths and one staff member death.[5] FCI Danbury reports nineteen open prisoner cases, two open staff cases, one death, as well as 79 and 59 inmates and staff, respectively, who have "recovered."[6] As noted

---

[5] BOP does not count inmates and staff who have "recovered" or died from COVID-19 in the "open" case totals.

[6] *See* https://www.bop.gov/coronavirus/.

below, however, a lack of testing renders that count inherently suspect.

On April 27, 2020, civil rights lawyers and several law school clinics filed a lawsuit in the District of Connecticut demanding that FCI Danbury meaningfully address the needs of medically vulnerable prisoners at FCI Danbury. *See* Memorandum in Support of Class Action Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241, *Martinez-Brooks v. Easter*, 20-cv-00569-MPS, D.E. 15 (D. Ct. April 30, 2020). Facts regarding the recent conditions at FCI Danbury are taken from that complaint and its supporting materials, as well as the court's May 12, 2020 order granting a temporary restraining order [D.E. 30].

"In the men's prison, there are seven units of open, dorm-style housing, two smaller rooms that can house ten to twelve inmates each, and three units of individual cells. Thus, the majority of the inmates at the men's prison live in large, open dormitories, with shared common spaces and bathrooms." *Martinez-Brooks*, 20-cv-00569-MPS (D.Ct. May 12, 2020), D.E. 30 at 8. As of June 4, 2020, Mr. Rovinski reports that he lives in a dormitory with approximately 56 other prisoners.

In late March, a male prisoner tested positive for COVID-19. *Martinez-Brooks*, D. Ct. 20-cv-00569, D.E. 15 at 3. By April 15, BOP was reporting 44 prisoners and 39 staff members were infected. *Id.* As of June 6, 2020, ninety-nine inmates at FCI Danbury have tested positive since the start of the pandemic, out of an inmate population of approximately 1,000.[7] One has died. *Id*. It is unclear how many tests have been conducted at FCI Danbury or how many prisoners who are exhibiting symptoms have not yet been tested. *See* D.E. 15 at 3-4.[8] This led the court to

---

[7] *Id*.

[8] Indeed, where widespread testing has been conducted, prison infection rates have been astronomical. At FCI Terminal Island, for instance *six hundred* inmate infections have been confirmed and four inmates have died. *See* https://www.bop.gov/coronavirus/ (accessed May 1,

conclude that these numbers "may well understate the true number of COVID-19 cases at FCI Danbury, in light of the limited testing that has been conducted." *Martinez-Brooks*, 2020 U.S. Dist. LEXIS 83300 at *11.

Prisoners have reported a medical response that is not only patently inadequate but actively dangerous. Prisoners with fever are sometimes taken to a medical unit – where other symptomatic individuals are – and are returned to their units and given Tylenol or cough syrup to see if their fever goes away. *See id.* D.E. 15 at 10-12 (citing Cassidy Decl., D.E. 1-4, ¶¶ 12-14; Harper Decl., D.E. 1-14, ¶¶ 5-6). One such prisoner who was returned to the unit was then "vomiting blood all week." D.E. 1-4 ¶ 14. "[I]nmates who complain to staff of symptoms consistent with COVID-19—including coughing, congestion, and shortness of breath—are routinely unable to obtain immediate medical examination, are not tested for COVID-19, and are returned to the general population until their symptoms worsen." *Martinez-Brooks*, 2020 U.S. Dist. LEXIS 83300 at *16. Individuals with fever as high as 103 degrees are left languishing in the units. D.E. 1-11 ¶ 13. Many prisoners who have COVID-19 symptoms other than fever, including coughs and difficulty breathing, have not been able to see a medical professional at all. *Id.* ¶ 14. One prisoner reported that "'[a]pproximately 80% of prisoners in [his] unit show flu-like symptoms, including fever, coughing, body aches, shortness of breath, chest pressure, and headaches.'" *Martinez-Brooks*, 2020 U.S. Dist. LEXIS 83300 at *17. Officials manipulate temperature checks to avoid finding symptomatic prisoners. *Id.* at *19. For instance, one female

---

2020). When the state of Ohio conducted mass testing inside its prisons, the numbers were staggering: 73 percent of the prisoners at one facility were infected. *See 73% of Inmates At An Ohio Prison Test Positive for Coronavirus*, NPR, April 20, 2020, *available at* https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus (Ohio is "'pulling off mass testing of their entire [prison] population inclusive of staff which … no other state is doing'").

inmate who was hospitalized with a 102-degree fever, due to COVID-19, had been told by Danbury staff just *one hour earlier* that her temperature was 97 degrees. *Id.* (emphasis added).

"It is undisputed that there is an active and serious outbreak of COVID-19 at FCI Danbury." *Id.* at *63. In fact, FCI Danbury was one of only three federal prisons specifically identified by Attorney General William Barr in an April 3, 2020 memo to the Director of the Bureau Prisons ordering immediate action to place vulnerable inmates on home confinement.[9] In the memo, Attorney General Barr noted the "significant levels of infection" at FCI Danbury, along with FCI Oakdale and FCI Elkton, and directed the Bureau was to move "as quickly as possible." *Id.*

In short, even absent sufficient testing to provide reliable numbers, the situation at Danbury is a "ticking time bomb." *United States v. Park*, No. 16-cr-473-RA (S.D.N.Y. Apr. 24, 2020) at 5 (granting compassionate release to Danbury inmate) (citing *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, L.A. Times (Mar. 20, 2020)[10]).

### 2.  Mr. Rovinski is particularly vulnerable to a severe COVID-19 infection.

Mr. Rovinski has medical, neurological, cognitive, and psychological conditions that place him at unique risk. These conditions make him medically vulnerable and diminish his ability to provide self-care.

Mr. Rovinski was born with cerebral palsy, a neurological disorder cause by a brain injury or malformation that occurs when the child's brain is under development (typically pre-

---

[9] Office of the Attorney General, *Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download

[10] *Available at* https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarce      ration

natal or shortly after birth).  He received extensive services and treatment in childhood from the

Shriners Hospitals' cerebral palsy program. While his visible symptoms now appear "mild" to a

lay observer, his limitations, detailed in the psychiatric evaluation, are much more profound. The

CDC identifies neurological disorders, specifically including cerebral palsy, among

"[u]nderlying medical conditions that may increase the risk of serious COVID-19 for individuals

of any age."[11]

Mr. Rovinski also has hypertension, for which he is prescribed carvedilol and aspirin. *See*

Med Records, Ex. 1, at pdf. pp. 91, 120, & 147. He also takes hydrochlorothiazide. *Id*.

Hypertension is identified by the CDC as a risk factor for severe illness and adverse outcomes.[12]

*See United States v. Salvagno*, No. 5:02-CR-51-LEK, 2020 U.S. Dist. LEXIS 95844 at *12-14

(N.D.N.Y. Apr. 23, 2020) (granting compassionate release to FCI Danbury inmate with

hypertension and no other health factor and collecting resources regarding the COVID-19 risks

associated with hypertension); *United States v. Sawicz,* No. 08-cr-287-ARR, 2020 U.S. Dist.

LEXIS 64418 at *5-6 (E.D.N.Y. Apr. 10, 2020) (granting release to FCI Danbury inmate whose

only risk factor was hypertension); *United States v. Hilow*, No. 15-cr-170-JD, D.E. 83 at 10

(D.N.H. June 2, 2020) ("even controlled hypertension in conjunction with COVID-19 is a health

risk").

*Salvagno*, *Sawicz*, and *Hilow* each relied, in part, on the dismal situation at FCI Danbury.

In *Sawicz*, Judge Ross of the Eastern District of New York granted compassionate release based

---

[11] *See* CDC, "Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission" at 10*, available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[12] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (reporting a 6% mortality rate for people with hypertension, based on a study of patients in China).

on "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications … because of his hypertension." 2020 U.S. Dist. LEXIS 64418 at *6; *see also Salvagno*, 2020 U.S. Dist. LEXIS 95844 at *14, *16 (granting compassionate release to Danbury prisoner with hypertension and a 2026 release date, in light of "the significant outbreak at FCI Danbury," which "creates a high likelihood that Defendant will be exposed to COVID-19, … even compared to other federal prisons," and collecting cases where courts have released people with "significant amount of time remaining on [their] sentence[s]"); *United States v. Hilow*, No. 15-cr-170-JD, D.E. 83 at 1-2 (D.N.H. June 2, 2020) (granting compassionate release to prisoner at FCI Danbury with hypertension, "mild" asthma, migraines, acid reflux disease, and mental health issues who had served 62 months of a 120-month mandatory minimum sentence); *United States v. Park*, No. 16-cr-473-RA at 7-8 (S.D.N.Y. Apr. 24, 2020) (granting release based on "the combination of Ms. Park's preexisting medical issues … and the worsening outbreak at FCI Danbury"). The court in *Salvagno* noted that, at the time of sentencing, it "did not intend for the sentence to include incurring a great and unforeseen risk of severe illness or death." 2020 U.S. Dist. LEXIS 95844 at *19 (internal quotation marks and citation omitted).

Finally, Mr. Rovinski struggles with neuromuscular, cognitive, and mental health disabilities, some of which are related to his cerebral palsy and some of which may have separate etiology. *See* Psych Eval. Mr. Rovinski has been diagnosed with major depressive disorder, for which he takes fluoxetine. *See* Med. Records, Ex. 1, at pdf. p.86. Mr. Rovinski has also been diagnosed with anxiety. *See id.* at 95, 101-02, 106, 115.[13] These conditions result in Mr.

---

[13] Additionally, he was diagnosed in childhood with attention deficit disorder. *See* D.E. 408-2 at 13; Psych. Eval. at 8, 18.

Rovinski's diminished capacity to provide self-care. *See Ramirez*, 2020 U.S. Dist. LEXIS 83363 at *11 (discussing COVID-19 as a medical condition that is "debilitat[ing] to the point that [prisoners] are incapable of self-care"). In line with this Court's observation in *Ramirez*, several courts have relied on similar non-medical conditions that diminish a prisoner's capacity for self-care in granting compassionate release due to COVID-19. For instance, in *United States v. Field*, the court granted compassionate release to a Danbury inmate with hypertension and "nonphysical health conditions that present challenges for self-care." No. 18-cr-426-JPO, D.E. 38 at 3 (S.D.N.Y. May 4, 2020). The defendant there had a speech impediment. *See id.* D.E. 30 at 7.[14]  The court held "that the COVID-19 pandemic, coupled with Defendant's physical and medical condition and the conditions at [Danbury], provide 'extraordinary and compelling reasons' for reducing his sentence." *Id.*; *see also Perez,* S.D.N.Y. 17-cr-513-3, 2020 U.S. Dist. LEXIS 57265 at *11 (granting compassionate release to prisoner who was in "weakened health" due to facial injuries, *see id.* at *2, although he had no COVID-specific vulnerabilities).

Mr. Rovinski has difficulty sustaining attention and managing complex tasks. *See* Psych. Eval. at 5 (weak working memory and slow processing speed); *id.* at 8 (ADHD); *id.* at 12 (complex task management); *id.* at 22 (difficulty with complexity, independent operation, and organization). These weaknesses make him less likely to effectively provide self-care. For instance, when Mr. Rovinski uses the phone or computer at the prison, he has difficulty processing that he might have been exposed to germs on the keyboard or phone, remembering

---

[14] The defendant in *Field* did not rely on any other medical conditions in seeking compassionate release. *See id.* D.E. 30 at 7 (government opposition arguing that: "the defendant provides no reason why the COVID-19 threat poses risks to him personally any more than the general prison population, let alone any basis to find that it constitutes an 'extraordinary and compelling reason' for his release. The defendant concedes that he is in good health and does not possess any particular attributes that make him uniquely vulnerable to the threat of COVID-19").

that he should not touch his face, and remembering to wash his hands as soon as he has access to do so. Mr. Rovinski's mother reports that he has difficulty maintaining his hygiene, particularly when experiencing a mental health exacerbation. This is corroborated by the BOP medical records. *See* Ex. 1 at 95 (Mr. Rovinski reported "periods in his life such as this one during which his depression seems to intensify and during such times his emotional dysphoria worsens and he becomes less functional").

In another example, correct hand-washing during the pandemic requires patience, attention to detail, and a strong motivation to take care of oneself. These skills are challenging for Mr. Rovinski. Further, Dr. Reade observed that Mr. Rovinski had some difficulty with fine motor movements. *See* Psych. Eval. at 17 (he had "some trouble writing and drawing with a pen, and there was marked tension, poor coordination, and mild spasticity in his movements"). These fine motor movements are required in order to correctly don a mask – making sure it adheres to the contours of the nose – and doff the mask without touching the exposed portion .[15] These minute tasks of thorough hand-washing and proper use of PPE require attention to detail, fine motor coordination, and a strong motivation to care for oneself, all of which are challenging for Mr. Rovinski. His capacity to provide self-care is diminished, both in warding off a COVID-19 infection and caring for himself if and when he contracts the virus.

In sum: Mr. Rovinski "make[s] a particularized showing of both individual susceptibility to the virus and a high risk of contracting it due to the conditions in [his] facility." *Ramirez*, 2020 U.S. Dist. LEXIS 83363, at *12 (citation omitted).

---

[15] *See* https://www.cdc.gov/hai/pdfs/ppe/PPE-Sequence.pdf

**C.  The section 3553(a) factors favor release.**

Mr. Rovinski was convicted of very serious crimes. His thoughts and words satisfied the

elements of the criminal conspiracy charges to which he pled guilty, and the Court was required

to impose a harsh 15-year sentence.  But the charge and sentence do not tell the whole story.  As

Dr. Reade explained:

> Before he met his co-defendant, David Wright, Mr. Rovinski
> entertained only general ideas about theoretical violence directed at
> theoretical enemies. He had no clear target and took no steps that
> suggested he had any plan, intent, or capacity to harm anyone.
> Organized and focused by Mr. Wright, however, Mr. Rovinski
> readily agreed to a plan to kill [PG], and followed Mr. Wright's
> lead to accomplish this plan. In my opinion, Mr. Rovinski would
> not have hatched this plan on his own, but needed the impulse and
> impetus provided by Mr. Wright.
> . . . .
> He is an extremely limited man who appears far more intact than
> he really is. In particular, he has trouble managing complexity,
> trouble operating independently, trouble with organization and
> strategy.
> . . . .
> Based on actuarial measures—including prior history of violence,
> arrest record, weapons training, weapons ownership, character
> pathology, age, gender, substance use history, mental illness, Mr.
> Rovinski's risk of violence is increased slightly by his history of
> arrests, but is otherwise at the very low end of the spectrum.
> Looking at clinical variables—like presence of psychiatric
> symptoms, current use/abuse of substances, character
> traits/structure, I would rate Mr. Rovinski's risk of violence at the
> low end of the spectrum. His cognitive limitations that interfere
> with his ability to plan, organize, and translate ideas into action all
> serve as protective factors. Mr. Rovinski is capable of constructing
> an angry phrase or idea, but he has little capacity to put those ideas
> into any kind of action.

Psych. Eval. at 22. The time Mr. Rovinski has already served provides sufficient punishment in

his unique circumstances and he poses no threat to the community going forward.

Against this backdrop, continuing to imprison Mr. Rovinski puts both him and other

inmates at risk by contributing to crowded congregate conditions in which the virus spreads. In

his April 3, 2020 Memorandum, Attorney General Barr recognized that "time is of the essence" and directed and directed the BOP to "maximize" transfers to home confinement, citing conditions at FCI Danbury specifically.[16] Despite those instructions, the BOP categorically refuses even to consider COVID-19 with regard to compassionate release requests, a stance that Judge Wolf recently described as "illogical" in the *Pena* case. Ex. 3 at 128. In addition, the BOP has tied its own hands with arbitrary criteria limiting home confinement eligibility. *See* April 22 Guidance;[17] Ex. 3 at 127 (describing BOP refusal to consider merits of home confinement for inmates who have not served 50 percent of their sentences as "utterly inconsistent" with the Attorney General's directives); *Martinez-Brooks*, 2020 U.S. Dist. LEXIS 83300 at *69-75 (discussing warden's refusal to meaningfully utilize home confinement) & *75-82 (same with regard to compassionate release).[18] Like the situation before Judge Wolf in *Pena*, Mr. Rovisnki will be disqualified from consideration for home confinement because he does not meet the "50-25 rule." Ex. 3 at 39. He will also be disqualified from consideration for home confinement

---

[16] *See* https://www.justice.gov/file/1266661/download

[17] https://famm.org/wp-content/uploads/bop-memo-4.23.2020.pdf . The document begins: "[i]n an effort to protect the health and safety of staff and inmates during the COVID-19 pandemic, it has become imperative to review at-risk inmates for placement on home confinement." It then proceeds to impose a laundry list of restrictions which would seem to thwart that stated goal.

[18] The court noted that, as of May 12, "of the nearly 1,000 inmates at FCI Danbury, only 159 inmates have been reviewed for home confinement, and only 21 of these have been released to home confinement." *Martinez-Brooks,* U.S. Dist. LEXIS 83300 at *35. "Since the beginning of the COVID-19 crisis, … the Warden has not approved a single request for compassionate release." *Id*. at *40; *see id*. at *79-80 (contrasting prisoners' "batting average" in the courts, where District of Connecticut courts have granted more than *half* of compassionate release requests); *id*. at *79 n.28 (noting similar situation at FCI Elkton). And two weeks *after* the issuance of a temporary restraining order, the court noted that "not one inmate has actually been released to home confinement pursuant to the Order." *Matinez-Brooks,* D. Conn. 20-569, D.E. 70 at 1 (May 29, 2020).

because he was convicted of a terrorism-related offense, without regard for the particular circumstances of the offense or his individual characteristics. *See* April 22 Guidance.

Ironically, it is the BOP's refusal to utilize the tempered and temporally limited tools it has at its disposal – home confinement and medical furlough – that leaves courts to face the all-or-nothing choice between leaving a prisoner inside a disease-ridden facility or releasing him from his sentence through compassionate release. *See Park*, S.D.N.Y. 16-473, D.E. 73 at 9 (where "the mechanism for granting temporary release … lies solely in the BOP's hands" and the BOP declines to utilize that mechanism, compassionate release is appropriate, even though "the Court would not otherwise have chosen to have Ms. Park serve only half of her sentence"). If this Court is displeased with that choice, the BOP bears responsibility because it has failed to meaningfully respond to the pandemic.

While Mr. Rovinski's "'original release date may be far off, the threat of COVID-19 is at his doorstep.'" *Salvagno*, 2020 U.S. Dist. LEXIS 95844 at *18 (quoting *United States v. Zukerman,* No. 16-cr-194, 2020 U.S. Dist. LEXIS 59588 at *11 (S.D.N.Y. Apr. 3, 2020)) (brackets omitted). Give the terrible risk of COVID-19, "continued detention…[is not] an appropriate or proportionate way to further the purposes of sentencing." *United States v. Asaro*, No. 17-cr-127-ARR, 2020 U.S. Dist. LEXIS 68044 at *21 (E.D.N.Y. Apr. 17, 2020).

**D.  Mr. Rovinski should be released forthwith to self-quarantine at home and should not be required to endure further isolation within BOP.**

The BOP has adopted an across-the-board practice of forcing prisoners approved for release to quarantine at the facility for 14-days before they can actually be released, even though this is not required. *See* Barr, April 3 Memorandum, above note 9 (permitting quarantine at the facility *or* at home). This "quarantine" is often served in solitary confinement-like isolation. Forcing people into solitary confinement-like confinement for two weeks is cruel, unnecessary,

and counterproductive. *See United States v. Scparta*, No. 18-cr-578-AJN, 2020 U.S. Dist. LEXIS 68935 at *9 (S.D.N.Y. Apr. 19, 2020) ("this is an illogical and self-defeating policy that appears to be inconsistent with the directive of the Attorney General, ungrounded in science, and a danger to both Mr. Scparta and the public health of the community"); *Martinez-Brooks*, 2020 U.S. Dist. LEXIS 83300 at *105 (D. Conn. May 12, 2020) (ordering modification of that requirement); Declaration of Professor Seth Prins, *Grinis v. Spaulding*, No. 20-10738 (D. Mass. Apr. 27, 2020), D.E. 38-4 (describing the quarantine policy as inhumane and "ineffective as a health measure").

Because Mr. Rovinski can safely can self-isolate at home, the Court should order the 14-day quarantine *at home*. *See Scparta*, 2020 U.S. Dist. LEXIS 68935 at *31 ("the Court will require [defendant] to instead self-isolate for 14 days in his home"); *Robinson*, 2020 U.S. Dist. LEXIS 73575 at *10 ("Upon his release and during his term of home confinement, [defendant] will satisfy the 14-day self-quarantine requirement"); *Sawicz*, 2020 U.S. Dist. LEXIS 64418 at *10 (the defendant "shall be released immediately upon the institution's receipt of this Order, and shall instead [of quarantining at the facility] spend 14 days in quarantine at the place he shall reside"); *Asaro*, 2020 U.S. Dist. LEXIS 68044 at *24 ("Defendant . . . shall not spend 14 days in quarantine at MCFP Springfield prior to his release").

## CONCLUSION

For the foregoing reasons, Mr. Rovinski respectfully requests that the Court grant a

reduction in his sentence to time served with a lifetime term of supervised release, subject to

whatever conditions the Court may deem necessary.

Respectfully submitted,

NICHOLAS ROVINSKI
By his attorneys,

*/s/ William Fick*
William W. Fick, BBO# 650562
Amy Barsky, BBO# 601111
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02210
857-321-8360
WFICK@FICKMARX.COM
ABARSKY@FICKMARX.COM

## Certificate of Service

I hereby certify that this document, filed through the ECF system, will be sent
electronically to the registered Participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as nonregistered participants on June 7, 2020.

*/s/ William Fick*
William Fick